I just want to make sure that Doug Evans is represented by Mr. Stewart who may be on the telephone. Can you hear us? Thank you, Your Honor. This is Scott Stewart. I can hear you. It's not the loudest, but I'll do my very best and I am grateful for the court's accommodation today. Okay. Well, we'll try to be louder just under the situation and circumstances. Mr. Kimmitt, is it Kimmitt? You may proceed with your argument, sir. Good morning, and may it please the court, Chris Kimmitt on behalf of plaintiffs. Can you put the microphone a little closer, just as close as you possibly can to your mouth? Sure. Bring it up and then speak really loudly. All right. I will do my very level best. Let me stop you there. Mr. Stewart, can you hear him all right? Your Honor, it was better just now when he was closer to the microphone. It was hard at first, but closer to the microphone, I think that should work. Thank you. All right. Plaintiffs brought this lawsuit because for the past three decades, Doug Evans' office has continued to do exactly what Justice Kavanaugh described in the Flowers' opinion. Proceed as if Batson had never been decided and engage in a reward-giving hearing. In fact, it was a relentless, determined effort to remove as many black prospective jurors as possible. When the district court dismissed this meritorious claim on abstention grounds, that decision was predicated on a fundamental misunderstanding of younger abstention. Younger abstention exists for a specific purpose, to stop state court litigants and particularly criminal defendants from making an end run around their state court proceedings by filing new actions in federal court. Courts may not abstain under younger unless they make all three of the following findings. First, that the federal lawsuit would interfere with the underlying state proceedings. Second, that the state proceedings implicate an important state interest. And third, that the federal plaintiff has an adequate opportunity to raise and to vindicate their federal claims in those same state proceedings. Here, abstention was categorically impermissible because plaintiffs had no adequate remedy in those state proceedings and independently because the federal lawsuit would not interfere in any way with those state proceedings. To start, everyone in this case agrees that plaintiffs cannot raise their federal constitutional challenge in the state proceedings because there will be prospective jurors there who are powerless to protest their own removal. Would the plaintiffs be prospective jurors in this county? Can you help us with your standing? Yes, absolutely, Your Honor. So all of, and I take Your Honor's question to be why we have standing. It's all of the above. Yes, who are your plaintiffs and what is their relationship and then how do you have standing as prospective jurors, which is a hard question. Yes, Your Honor, of course. All right, so plaintiffs are four individual black residents of Mississippi's fifth judicial district, all of whom are registered to vote, who are of age and who are statutorily qualified to serve as jurors. We also have an organizational plaintiff, the Atolla County NAACP, which is comprised of 52 members, each of whom is similarly situated to our individual plaintiffs, being black residents of the counties that comprise this district and being eligible, ready, and able to vote. So as this court and the Supreme Court have consistently held, racial minorities have standing to obtain prospective relief from jury selection systems that are consistently administered so as to exclude them from jury service. Now each of the elements, that's from Society of Separationists versus Herman, now each of the elements of that standard are satisfied here. First, as already discussed, plaintiffs are racial minorities. Second, there is a jury system that excludes them from jury service because they have pled in the complaint that Doug Evans has a policy or practice, and I mean Doug Evans in his office, of striking black jurors at a disproportionate rate, that his office strikes black jurors 4.4 times more frequently than white jurors, that a black juror is 6.7 times more likely to be struck by Doug Evans' office than a similarly situated white juror, and that this is the product of intentional discrimination. Does it matter that your clients have not suffered from unlawful, proved to reach strikes in the past? Your Honor, because we're seeking prospective relief here, the question is whether or not there is an imminent injury, and that takes me to the last kind of element of this test, which is we need to show that there is a consistently administered policy. It's not enough that there just has been a policy of exclusion. That policy under this circuit's case law must be consistently administered so as to make out a showing of imminence, but we can make that out here, and the reason is because plaintiffs have pled that this policy of striking black jurors has persisted for 30 years, that it continues to this day, that it pervades jury selection in every one of the seven counties that comprise the Fifth Judicial District, that it happens in trials for crimes large and small, and that it happens regardless of whether the criminal defendant is white or is black, though it certainly happens more frequently if the defendant is black. That shows that it is consistently administered, which is what this Court has shown, or which in order to have standing. So you can look to Society of Separationists versus Herman, or you can look to Ciudadanos Unidos, in which this Court found that similarly situated plaintiffs had standing to bring a jury discrimination challenge because they were Mexican-American members of a district where the grand jury commissioners were making selections as to who got to serve on a grand jury that was consistently administered so as to disproportionately under-represent them. So— Did you seek a class action here? Yes, Your Honor. So this is— Mr. Brown did not certify class? Because, Mr.— Actually, I must ask you some questions. No class was certified, correct? No, Your Honor. It seems to me your four individual plaintiffs, when you look at whether injury to them is a near certainty or a high likelihood, in a lot of cases what I was talking about, it seems like you have a very hard road to hoe that it is impending as to those four people. Does either the fact—and you disagree with that, but I want you to take that as a premise that you have to work with—does the fact that you're seeking a class or the fact that the NAACP chapter is a party help you? I think— Or standing? Or standing? I think that the fact that we have the Atala NAACP, which is comprised of 52 members, means that in any given year, several of those members are going to be summoned to jury service and subject to the selection— Is that in the evidence? Yes, Your Honor. We filed an affidavit from Antonio Riley to that effect. Second, I don't think that the fact that this is a putative class matters because the individual plaintiffs still have to have standing, so I don't think that we can rely on that. But I want to get back to what we need to show for eminence, and because this is an equal protection case, it's not a case that turns on the jurors actually being struck on account of their race. We don't need to show that, because the injury in a case like this that's an equal protection case is simply the imposition of a barrier that's going to stop plaintiffs from being able to receive equal consideration for jury service. So you can look at— But this is not a systemic practice that the clerk and the commissioners, the powers case, it seems difficult because of that, unlike a challenge of systemic practices of the clerk and commissioners, because it involves a prosecutor, the prosecutor has to do something wrong, and it's not the type of systemic thing that could be easily anticipated, and we would know it's imminent every time the prosecutor is going to do something wrong. Your Honor, respectfully, we've pled that it is a consistently administered process, and that Doug Evans has done this for three decades at this point, and he's done it without  So I think that we've pled systemic practice here, and again, because we're talking about an equal protection claim, there's no case from this circuit in which there has been some sort of systemic practice, and this Court has failed to find that there is standing for plaintiffs who are racial minorities and who are being excluded because of that practice to challenge it. Are you familiar with our decision from earlier this year? It was an ADA case involving Professor Breit. I mean, there the plaintiff had been summoned for jury duty in the past, right? Yes, Your Honor. I mean, that's a bigger urban county. How does that relate to the standing here? Thank you, Your Honor. So I have two responses. First, the nature of the injury in Crawford is fundamentally different than the nature of the injury here, and so it affects the imminence inquiry. So in Crawford, the nature of the injury was the actual exclusion from jury service because it was an ADA claim, not an equal protection claim. But the Supreme Court and this Court have made clear in the equal protection context that it's merely the imposition of the barrier, which is Doug Evans' policy, that constitutes the injury. So you don't need to show as much as you would need to show in Crawford. But even assuming that we did need to make out the same showing that the plaintiff made in Crawford, we can make it here because we've pled equivalent facts in our brief, sorry, in our complaint. So Crawford turns on three facts. It says, first, Hines County is not a terribly populous county, fact number one. Fact number two, not all residents of Hines County are eligible for jury service. Fact number three, Mr. Crawford's history of being called for jury service in the past insofar as that tells us about the likelihood in the future. So Mr. Crawford was called for jury service twice between 2006 and 2017. So those are the three facts in Crawford that get you to eminence. So let's talk about our complaint. Here we are talking about seven rural counties that combined are smaller than Hines County is. So we also have a not terribly populous county. We've also pled that not all the members, not all the residents of this county are going to be called for jury duty. Finally, we've also demonstrated by showing the statistics of who's eligible for jury service and how many people are summoned each year that show us that the plaintiffs in this case are likely to be called the exact same amount as Mr. Crawford was called. He was called twice between 2006 and 2017. Given the odds based on the number of summonses and the number of people eligible to be summoned, you would expect that each of our plaintiffs would be called the exact same frequency as Mr. Crawford. So we've pled the exact same facts. Your time's running down, so I don't know if you want to go back to Younger. On Younger, I have a question whether reversing here would create a split with the 11th Circuit's Hall decision. Whether it wouldn't create a split with the Hall decision, and that's true for a couple of reasons. So first, the relief sought in Hall is fundamentally different and far more intrusive than the I mean, we intentionally tailored our relief so as not to have a Hall issue. So in Hall, the plaintiff there asked for a mandatory injunction that was going to request all manner of different specific affirmative actions, both on the part of the court and on the part of the prosecutor's office. It was going to change the way that the prosecutor was allowed to do jury selection. It was going to impose a federal monitor and have kind of this continuous reporting system. They were going to have to give notice to the plaintiff so that they could go to court and monitor court proceedings. There's two or three other parts of a mandatory injunction, all of which are absent here. And so the interference that the court hung its hat on in Hall is completely absent in this case. So I want to focus on what our injunction is and what makes it so different. So literally, all that we have asked in this case, it is very modest, is we have asked for a simple prohibitory injunction that says, Doug Evans' office is not allowed to maintain its policy, custom, or usage of striking black jurors. Finished. The end. That isn't going to interfere with a single proceeding. We haven't asked to change, we haven't asked to take any sort of affirmative actions. We haven't asked— But it's already the law that you can't engage in discrimination in jury selection. So, I mean, what's that really going to do? I mean, it seems to me it's all about then what would happen after that and the enforcement of that injunction, since the injunction is just saying, follow the law. Yes. So I would like to talk about what happens during enforcement. So here's how I imagine enforcement would play out. We have this injunction. Now, because we've asked for an injunction that specifically targets a practice and it doesn't target individual acts of discrimination, what we would then need to prove is that he has an ongoing practice. So I think what would happen is we would come back as class counsel after a year, and we would say, we have monitored all of the public trials during this time, and we have evidence that shows that Doug Evans has continued to violate this court's order, and then we would ask for appropriate relief. We would never seek to intervene in a pending jury selection proceeding. So the interference that's required by O'Shea would not and could not ever happen in this case. And so all is fundamentally different. O'Shea doesn't apply, and I see that my . . . Would you have to go through every single one of the voir dires, and what if nobody raised any backs and challenge in the voir dire? Just the fact that whether or not someone who is black was on the jury or was stricken doesn't establish that someone's engaged in a systemic practice. And so you would have to look at why was the person not selected. Were they not close far enough in the front of the pool, that they were too far back and they didn't get picked, or because they . . . or were they . . . you know, they had some other answer to a question, they had been a, you know, a crime victim or had a relative in prison or, you know, all of the reasons that you can say that someone might not be a particular juror in a case, but those won't be tested. And so you can't just use numbers to determine whether or not he's . . . you would have to use what he said during voir dire, wouldn't you? No, Your Honor. What would you have to . . . I don't understand how you would monitor this, so that's . . . am I wrong that you can strike people . . . that you certainly can strike people if they're of a different race, if there's a legal reason, I mean, a basis, and that's what Batson allows you to do. Of course. Oh, we would absolutely agree that Doug Evans can strike black prospective jurors for a valid reason. I turn this Court's attention to McGee v. King, which is a 1975 decision from this Court, and what McGee v. King says is when you have a case of systemic discrimination, either at the trial level or at the grand jury level, there's an established Supreme Court test from Alexander v. Louisiana that you apply, and here's what we would need to do. We would first need to show that there is a significant statistical disparity between Doug Evans' strike rates against black prospective jurors and white prospective jurors. Then, if we showed a significant statistical disparity, we would then have to show that Doug Evans knew, or Doug Evans' office knew the race of the jurors they were striking, which is true in all peremptory challenges. So once we establish those two things, which I think . . . and we would never proceed if we couldn't establish those two things, we've then made out a prima facie case. The burden then shifts to Doug Evans' office to justify those strikes on a racially neutral basis, and at that point, I imagine that they would attack the statistical evidence, they would present an expert. I don't know exactly how they'd wish to proceed. But how could they dig down after the fact in a case? Are they going to have to keep a note from every single time they've stricken someone? Because they're not going to maybe have it, because they won't have been challenged at the time. I don't understand how they would rebut. Your Honor, I think that's the same . . . I mean, that's also the same as every other time this binding test has been applied. So I don't think that that is a reason to . . . But they would have to start just keeping all kinds of information just in case for this purpose, even if it's not relevant for their actual try. Your Honor, I think the most obvious way they would proceed is with some sort of statistical expert, but I also want to point out that even if they started keeping additional information as a result of this, that's not the type of interference contemplated by O'Shea. O'Shea is concerned with a very specific type of interference with, in its words, the abrasive and unmanageable intercession caused by federal courts continuously interrupting state court proceedings in order to decide legal decisions, legal issues, ab initio. And we have nothing like that. Or you can look to BICE. BICE says in order to establish interference, what you need to do is you have to see whether you are interfering with the state court's ability to conduct the proceedings. That's from BICE. It's binding on this court. I think you've answered the question, and we've gone over your time. All right. Thank you, Your Honor. And I guess the other side should have a couple more minutes if they need it, but they don't have to take them because we did go over. Great. I appreciate the court's indulgence. Thank you. Thank you for answering my questions. Do you want to go ahead, Mr. Stewart?   I'm Scott Stewart. I'm here on behalf of the U.S. Supreme Court. I'm Scott Stewart on behalf of District Attorney Doug Evans. The district court was right to dismiss this lawsuit seeking to impose indefinite federal court supervision over innumerable state criminal trials in Mississippi. I'd like to get right to abstention, Your Honors, and pick up on some of the questions that I think we're getting on just the right points on really what decides this appeal. I think the fundamental problem on abstention for my friend, Mr. Kemet, is that if his position were correct, O'Shea would have come out the other way. The easiest way to see that, I think, is to look at the fact that O'Shea itself rejected — the most modest remedy it rejected is still too much to overcome abstention principles — was a periodic reporting system. The Seventh Circuit had thrown that out, said, hey, look, we don't necessarily envision constant day-to-day supervision. Maybe a periodic reporting system every now and again would be enough. And the Supreme Court said, no, absolutely not. That is antipathetic to principles of comity and just cannot happen. The periodic reporting system is exactly the remedy the plaintiffs have described seeking in this case. Yet in 80 pages of their merits briefing in this court, as far as my eyes can tell, they do not mention the periodic reporting system and its treatment of it by the Supreme Court in O'Shea, even though that forecloses their position. And, again, the problem there is that kind of ongoing oversight and monitoring of a state court proceeding by district courts of executive actions, that's a problem that's foreclosed under principles of equity, comity, and federalism. But I think you can really see — and I think Judge Elba's points were getting to this — questions were getting to this — and that's — it's not going to stop at a periodic reporting system. Surely, there will be individual challenges by individual jurors, and for that, you just have a federal injunction, you have this class that would presumably be the beneficiaries of it, and you have this injunction where any member of the class could at any time take advantage of it. And my friend, Mr. Kemet, in his complaint — this is page 11 of the complaint, paragraph 43 — describes being discriminated against during jury selection as causing stigmatic and dignitary harm and profound personal humiliation. Now, we take that as true, and if that's — if that's correct, then it's hard to imagine why a struck juror would not seek to take advantage of this injunction and would try to go have it enforced in federal court immediately. And his class counsel, Mr. Kemet, whoever else's class counsel, would need to represent him adequately. And I don't think we should take him to be saying he would not go to seek and vindicate rights under the injunction. So this injunction has to be — should be expected to be enforced, should be expected to have real bite, and it just shows how overreaching and improper this remedy is. So it's not a modest remedy. And I'd emphasize — and I think this gets back to the point of — that my friend was addressing on how to kind of square this case with Hall. I think my friend's ground of distinction there was, hey, look, in Hall, the plaintiffs sought a much more — much broader injunction. And Mr. Kemet said, we here have tailored our injunction, described it in much teamer terms. O'Shea is not a pleading device. In the Supreme Court, in O'Shea, the court looked to the natural consequences of the injunction and the harm that it would inflict on federal-state relations, and it said, look, that's too much. That's why the court said that even this modulated periodic reporting system was too much. So for all those reasons, the relief here sought — you look at the natural effect of it, and even if it gets the most modest, the periodic reporting system, it is squarely foreclosed by O'Shea. Counsel, that is — You go ahead. We're having a battle here. Who gets to answer the next question? I'll proceed, Mr. Stewart. Your interpretation of O'Shea, it seems to me, requires us to distinguish — to distinguish O'Shea from Younger itself, and I say that because of Sprint. Sprint says, henceforth and forevermore, this is what Younger means. I think, relatively undisputed, O'Shea started, at least, as an application of Younger. You could use a different word than application. Extension is probably one you'd like me to grab onto. Does your argument require us to identify O'Shea as a separate form of abstention from Younger in order to avoid Sprint blocking your argument? I think it's — the way I would phrase it this way, Your Honor, and then I think I'll circle back and say more directly, is it's an application of the same principles applied in Younger, but to a different kind of forward-looking future proceedings context. And O'Shea is not — these abstention doctrines are not rigidly confined, but they're instead expressions of these overarching principles that apply across context — equity, comity, federalism. So I'm not particularly wedded to describing it as, you know, a distinct extension, extension, application. I think the important point is that it doesn't make sense to unyieldingly apply the stated requirements in Younger to the O'Shea context because they're focused on different things and they're trying to sensibly apply overarching principles. And to do so wouldn't make a great deal of sense when — as I recall, I don't think Sprint even mentioned O'Shea. The two are focused on different situations. They honor the same principles. But a kind of rigid adherence to the words expressed in certain opinions doesn't make a whole lot of sense in a context where you're dealing with those huge, timeless, overarching principles. Counsel, stop on that, please. It's hard with you on the telephone for you to pick up on the cues. But let me ask you — it's one thing to say, and I certainly understand from your viewpoint why you want to say that, why we shouldn't look at these principles as necessarily being in individual containers and there's a lot of feeding of Younger into O'Shea and it'd create a different doctrine. But to me, the problem is Sprint, a unanimous decision of the big court, says — and then maybe even — it doesn't say, but maybe it implies that Younger needs to be a more limited doctrine than some of the courts have been interpreting it to be. And here's what you need. And so it really is quite important to identify what is Younger extension versus what is something else, or else that other doctrine is limited by Sprint. So I don't know what you said already sort of covers my concern about your argument, but do you have anything else to add about the importance of identifying just what Younger extension is? Or are you going to say Sprint is not quite as rigid as I'm interpreting it to be? I think it's not quite as rigid, Your Honor, with respect to other forms of extension that are applying to somewhat different contexts. Again, I'm pretty sure that Sprint itself never mentions O'Shea. So I think we have to take O'Shea on its terms as we find it. And what by its own terms it's doing is it's vindicating the principles that were also applied in Younger. So maybe it looks like Younger has had more difficulty over the years in being applied and maybe the Supreme Court in Sprint is kind of expressing a concern that says, hey, look, this has gotten a little too broad for what Younger itself is for. But I don't think we see that sort of, I don't know, sprawl or creep with O'Shea. It just doesn't come up as much, it seems, because O'Shea seemed to pretty clearly shut the door on cases like this. So I think Judge Hamilton in the Seventh Circuit in the courthouse news case, Your Honor, had a good description of this where he kind of says, look, and this is consistent with the Supreme Court's footnote in Penzo, it says, look, these are not rigid pigeonholes. The extension doctrines are a little flexible. And I think Sprint is itself imposing some discipline on Younger and say wayward applications of that. But it doesn't by its terms limit O'Shea. And again, Your Honor, I'd also just say this is a square application of O'Shea. This is very much in the heartland of O'Shea. So I think you just kind of apply the terms of that opinion in its holding and you've got the answer and it's completely consistent with Sprint. Counsel, whether we call it the Younger line or the O'Shea line, when you look at O'Shea and the plaintiffs there were defendants in state court criminal proceedings and so they could raise their federal claims in state courts. State courts, of course, can resolve federal claims. And as I see it, every Younger, if we want to call it the Younger group of cases or the Younger cases, seems to involve plaintiffs in federal court who were parties in the state court proceeding and thus could raise the federal claim in that pending state court proceeding that the federal court is concerned about interfering or enjoining. Can you point to any case, but that's not the case here because these jurors, they get excluded, they get in the car, they go home and go about their business. Can you point to any case where the federal plaintiffs were not parties or even potential parties to the state proceeding? If I understand the question, Your Honor, I think there would be this kind of a fact pattern in Hall out of the 11th Circuit where I believe it would be the same kind of… Right, Hall would be one. Other than, I guess, a jury. Yeah, other than Hall. You're right about Hall. Right. I think, Your Honor, I don't think there are a lot, but I also don't think there are very… There's just not a huge universe, I don't think, of those Shirley cases, say, compared to Younger. But I think here are two, I think, important points there, Your Honor. One is, in the Younger context, it makes… You can see a greater case for saying, hey, you need a remedy in the underlying state proceedings because, by hypothesis, you're in underlying proceedings and you're shooting up to a federal court to kind of try to stop those proceedings. So it makes sense, hey, what's available in that underlying proceeding? In O'Shea, however, you're looking kind of at this forward-looking, systemic, overarching district court supervision, and the court in O'Shea, and this is at page 502, it didn't say, hey, you need a remedy in the underlying state proceedings. Its language was, quote, there are available state and federal procedures which could provide relief from the wrongful conduct alleged. It doesn't say the plaintiff needed that relief. And it looked at various remedies that were not ones that the plaintiff there would themselves be seeking. You know, federal criminal prosecutions, disciplinary proceedings that would presumably have been brought by someone else. So are you saying it's the fact that the defendant here in these state cases could raise a Batson challenge, which is true, of course, or is it like the district court said, well, sure, these jurors can't complain in the state criminal case that they were excluded, but they could bring a 1983 claim in state court? Because that latter would just seem to, I mean, someone can always bring a 1983 claim in state court. Why would we ever have, you know, federal 1983 claims? Right, Your Honor. I think two observations in response to that. I do think the Batson procedure itself is enough in this situation. And again, the Batson situation, because it implicates kind of two rights holders under the Supreme Court's decision, it's a little bit different so than maybe mine run O'Shea case, but the defendant in a criminal trial has a very strong incentive to bring that claim. And there are also the other claims we raised. I would add, though, Your Honor. I don't understand why a Batson is enough. I'm sorry, Your Honor? It's not, it doesn't, it only protects the integrity of that conviction, not of the, I mean, I guess if the jurors get receded right then, but otherwise it's, it doesn't vindicate the rights of these people. I think it vindicates them to the extent needed under O'Shea, Your Honor. And that's just, the language I quoted earlier about providing relief from the wrongful conduct alleged. O'Shea doesn't say, hey, you have to be able to yourself get an injunctive remedy in some other court. It says, are there other mechanisms, procedures that address this harm such that you don't need this very, very extraordinary federal court invasive injunction? And here there are those measures, Your Honor, so you don't need that mechanism. And Batson itself, again, the remedy describes empowers disciplinary proceedings. The plaintiffs here, to my knowledge, never tried to file or raise why it would be, they'd be unable to file a state court proceeding for relief of an injunctive sort, so. And their argument is that Batson has not been a deterrent. That they say Batson's been there and Batson has not been a deterrent. So Batson itself is not being, that they say not only does it not protect the rights, but it also has not had any of the effect to deter the conduct. But I have a question, a different question, about declaratory relief. If it's just a statement about what the law is, and it doesn't mean that you can in the future get an injunction because a different proceeding would have to decide that, why isn't declaratory relief available here? Sure, Your Honor. And if I may, I'd also want to, just after that answer, answer Your Honor's previous point. Declaratory relief generally functions as an injunction. You know, it may not impose a coercive, pardon me, you must do this, you must not do this at this time, but that's the follow-on logical relief. There are rare circumstances in which a declaration, so like, I think in the Steffel case, for example, hey look, a declaratory judgment saying a statute reaches too much speech, for example, is different from an injunction because it leaves the state courts open to issue a narrowing construction and for prosecution still to happen. Here, however, a declaratory judgment still has that same, we're going to go to federal court and monitor things, it's the same consequence, Your Honor, in this instance as it so often is. But if you structure the remedy in a way that would not interfere, if you do a declaratory judgment, you're not automatically giving an injunction, that's saved for later and it might just help make the 1983 damage claims easier or something, you know, if it's already been established that that's a violation of the law to do that. I think, Your Honor, you still have, though, the federal oversight of the district court and I think you also just have the natural consequence of what's later going to happen, which is, again, the plaintiffs here, even if they're most modest, what they want is a periodic reporting system and say, hey federal court, this is happening, this is not happening, do something about it. And we have to take, I think, except as given, that a federal court is not just going to give idle, kind of out there, abstract relief with no consequence. And I think the natural consequence of a declaratory judgment is, look, judgment is being passed on state courts and we're going to see invasiveness and ongoing monitoring over time. Your Honor, can I quickly address Your Honor's point about that arguably not being a good enough remedy in the past? Sure. The point I would say there, Your Honor, is that, one, the complaint here focuses on files itself and then kind of aggregated statistics. So I would question the power of that to show that Batson hasn't been a good remedy, especially when Batson was repeatedly… Well, that's the argument. I'm not saying the court accepts that, but that's their position in the case. Right, Your Honor. And what I would just emphasize is that it doesn't… I think the same type of claim was being pressed or was there in O'Shea, and that didn't really affect things either. It was, look, the injunction here would go way too far. We can't have it. And, I mean, again, my friend does emphasize that he's alleged very bad conduct, but the I mean, it was discriminatory practices that led to longer sentences, worse sentencing conditions, burdens of trial, so people actually losing their liberty. It was really bad, but the Supreme Court didn't have its judgment turned on that. It looked instead at the nature of the relief and said, look, this is just too much, and there are other procedures, and those are the ones that are there. Mr. Stewart, if you could address standing, and the same question I asked the other side, if you could address the Crawford case we recently decided, and in particular there it says Hines County's not that big, so it makes it more likely this plaintiff's going to be called for jury service again. Here we have a smaller county. I mean, I'm not sure how that shakes. The risks are different because in the bigger counties you have more trials. I'm not really sure what the statistics are, but if you just want to address Crawford. Thank you, Your Honor. Yes, I think in Crawford you had a much stronger… I think you're right, Your Honor, that it's a mistake just to look at population because the number of trials matters a lot. I mean, if you're in a county served by hypothesis that only has two trials, then even if your population isn't huge, the chances may be slim. And I think what you had in Crawford was, number one, you had a policy that was just in effect that was just ironclad, no access if somebody with a disability came to the courtroom. And then on the other hand, you had somebody who had actually been called for jury duty multiple times in recent years. The majority mentioned twice. The concurring opinion added two more to that. And here, though, Your Honor, I mean, just looking at the allegations of the complaint, you have one main plaintiff who was engaged with the jury selection process, and that was 15 years ago. And even if that were good enough for retrospective relief, and I'm not saying it would be, it's not anywhere close to what you need for prospective relief of the sort sought by the plaintiffs here. I mean, that's just, I mean, it just is not enough. It doesn't have a definite impact. There's just no good reason to think that it's certainly impending that one of the main plaintiffs here is going to be subject to jury service. If I can distinguish also, Your Honor. I have one question on Crawford. It actually seems to me that if you've just recently been called for jury service, the way a lot of jurisdictions work, that means it's less likely it's going to be imminent in the next few years, because if you've been called, you're excluded for a certain amount of time. So I guess I'm not sure why that, if anything, that might counter the opposite, whereas someone who's been on the rolls for 10 years and hasn't been called, in other words, has a greater chance of being called in the next couple years than someone who's been called twice in the last 10 years. Understood, Your Honor. I mean, I think there, the particular plaintiff had been called a good number of times, despite the fact, again, that he's been called recently. What we have here, though, is that we can only speculate as to whether it's more likely that each of the named plaintiff's numbers is going to come up, so to speak, and we have no indication that that's likely to happen, certainly not any indication that it's certainly impending. And they are, therefore, that number of steps removed. I would say that that's a key distinction. I realize I'm getting, I'm over or near my time, so I'll be brief, but this is different from the bidding case that my friend emphasizes out of, I believe it was out of Florida, where basically somebody ready and willing to bid in a process is basically past all, they're facing the policy they claim. Here, somebody in plaintiff's shoes are many steps removed from that process, may never see it, and even when they're confronted with the alleged policy, they may be struck or not struck. And if they are struck, they could be struck on a completely valid basis. So very different thing. It's also very different from the various cases that deal with pre, you know, things that happen before the proceedings on a systematic basis. This is kind of a person-by-person thing that ends up happening in actual jury selection. Okay. Thank you. We have your... Thank you, Your Honor. Again, thank you to the court for the accommodation. Thank you. Mr. Kimmitt, you've saved time for rebuttal. Thank you, Your Honors. A handful of points. First, a problem that pervades the state's entire argument is that they take this one quote from a Seventh Circuit decision called Courthouse News Services v. Brown that suggests that courts can look at the kind of underlying policy reasons to abstain and perform its own ad hoc balancing. The reason they look to the Seventh Circuit as opposed to the Fifth Circuit where they are is because it's directly contrary to Fifth Circuit law, such as O'Donnell v. Harris, which says you must apply the younger factors. But moreover, that Courthouse News case is actually just bad law everywhere. So, I'd point you to another Courthouse News case. There are lots of Courthouse News cases. This one in the Fourth Circuit, Courthouse News Services v. Schaeffer, which is 2F4-318 Pennsite 325, Fourth Circuit, 2021. And in that case, Courthouse News, the party tried to point to this Brown case from the Fourth Circuit wasn't having it. They said that in the Seventh Circuit they based their decision on these more general principles of federalism. The Fourth Circuit says, such an approach is inconsistent with our precedent and Supreme Court guidance, and then says, the Supreme Court has never allowed abstention to be a license for free-form ad hoc judicial balancing of the totality of state and federal interests in a case, which is exactly what Mr. Evans is trying to do here. Next, in order to abstain, you need to have an adequate remedy. You need to have an adequate remedy in the underlying state proceedings, and plaintiffs must be able to raise it themselves. That is the holding of a whole host of Supreme Court cases. It's the holding of Middlesex, of Stefel, Kugler, Gibson, of at least a half-dozen different cases. It says, the entire theory of abstention, not just younger abstention, abstention period, is that a federal court cannot dismiss a federal claim unless the federal plaintiffs can themselves raise that claim in the challenged state proceedings. Everybody agrees that plaintiffs here cannot do so, and Mr. Evans tries to kind of come up with a series of creative, adequate remedies, but none of them involve plaintiffs raising their constitutional challenges in the underlying state proceedings as mandated by all of these cases, very much including O'Shea. And I want to point to a quirk of their kind of interpretive approach to O'Shea. So, they try and say that O'Shea is somehow fundamentally different than Younger, that it doesn't adopt this adequate remedy at law requirement from Younger, which is the third Middlesex prompt. But it's a really curious way of disavowing that requirement, because the decision, or the abstention part of the decision, starts by quoting that part of Younger, saying that you should abstain when there's an adequate remedy of law. And then they have an express discussion of whether there's an adequate remedy of law, where they say, if these plaintiffs are tried and prosecuted for cases, that is, if they become parties to state cases, they'll have adequate remedies. And it goes through various remedies that they would have in the state proceedings. And then the opinion concludes by basically saying, there's interference and there's adequate remedy at law. That is the Younger test. They literally apply the Younger test using the Younger words. Yet Mr. Evans comes up here and says, well, when they said adequate remedy at law, and then did the same test as Younger, and then made a ruling that's the right ruling under Younger, they actually meant something else. But that doesn't make any sense. Next, they suggest that Batson might be an adequate remedy by itself. First, that's inconsistent with Middlesex and all the cases that say that plaintiffs have to be able to raise it themselves. Secondly, no case has ever supported that sort of remedy as being an adequate remedy. Third, there are all sorts of reasons. I'm a former defense attorney. There are lots of reasons why you might not object when the other side strikes somebody, even if you think it's being done for racially discriminatory reasons. You might think that's a bad juror for you on the merits, even if the other side is striking them on account of race. And you wouldn't object. Finally, Mr. Evans has repeatedly said that there's going to be interruption. And he keeps arguing over and over again that any time that a juror is removed, is struck from a case, this will inevitably lead to halting that underlying state court case. First off, we expressly disavow that on the record as class counsel. We will never, ever do that. We are bound going forward. Second, jurors don't know why they're struck or who struck them under Mississippi Rule of Criminal Procedure 18.4E. Third, an individual strike cannot be the basis for an injunction, for a finding of an enforcement action anyway, because we plot a policy. We need to wrap it up. Furthermore, that's not the remedy that we sought. We didn't seek any sort of interruption. And there's no reason that the district court here would be forced to follow the unconstitutional means of remedying that, other than simply providing an appropriate remedy. They've never explained otherwise. Thank you so much, Your Honors. We urge you to reverse. Thank you. This case is submitted.